BEAN v. BEAN.

1. PARTIES—EQUITY—MISJOINDER—PLEADING—WAIVER.
   The claim that complainants having similar rights are improperly joined in a suit to restrain defendants from using a right of way over complainants' lands, is waived by the filing of a cross-bill in which defendants pray for relief against both complainants.

2. ADVERSE POSSESSION—EVIDENCE—EASEMENTS.
   Evidence examined and held to show that complainants' grantor was the owner by adverse possession of a driveway 14 feet in width connecting his homestead with a farm held by him and afterwards conveyed by complainant to one of the defendants.

3. SAME—REAL PPOPERTY—COLOR OF TITLE.
   Entry upon and possession of lands by a person as his own, even without color of right, is sufficient to start adverse possession.

4. SAME—STATUTE OF LIMITATIONS—PRESCRIPTION.
   The right to and the use of a right of way may be acquired by adverse possession or prescription the same as title to the fee of the land.

5. SAME.
   Possession and use of the strip of land, connecting two farms, without any permission from the owner, and sufficiently visible or notorious to raise the presumption of notice, is evidence of an adverse claim of title, although the driveway was never used for crops.

6. PARTIES—EASEMENTS—JUDGMENTS.
   A decree in a suit to enjoin a trespass wherein defendants claim a right of way by prescription and ask affirmative relief by cross-bill, cannot affect rights of an adjoining proprietor who is not a party.

7. ADVERSE POSSESSION—LICENSE—RIGHT OF WAY.
   Testimony showing that the owner of the land so used was unfriendly to the one using it, that the strip was fenced off and used exclusively by him for more than 15 years, and no one ever questioned his right to it, sufficiently shows a right by prescription, in the absence of evidence that the use was permissive or licensed.

8. SAME—REQUIREMENTS.

Adverse possession must continue for the entire statutory period, and have been actual, open, visible, notorious, continuous, and hostile.

9. EASEMENTS—WAY OF NECESSITY—APPURTENANCES.

Where the grantor of lands, which have no access to a highway, owns the intervening realty, over which a right of way has existed to the highway, a way of necessity along the existing route, passes to the grantee.

10. SAME—VOLUNTARY GRANT.

An easement or way of necessity will pass by implication as well where the severance of dominant and servient estates is effected by legal proceedings as where the grant is voluntary, and it passes with each successive transfer of title.

11. SAME.

When the owner of an entire estate makes one part of it visibly dependent for the means of access upon another, and creates a way for its benefit over the other, and then grants the dependent part, the other part becomes subservient thereto, and the way constitutes an easement appurtenant to the estate granted, and passes to the grantee as accessorial to the beneficial use and enjoyment of the granted premises.

12. SAME—EASEMENTS AND SERVITUDES.

Whether the grantor of the premises owns the passageway or has a right to its use by prescription, as an appurtenance to the dominant estate, the right passes with the grant.

13. SAME—WAY OF NECESSITY—TERMINATION.

An attempt to secure a passageway to the highway in another direction by agreement with an adjacent proprietor, does not defeat the way by necessity where the proposed new route proves to be impassable and worthless.

14. SAME—PLEADING—AMENDMENTS.

A prayer in defendants' cross-bill that the decree declare an easement to exist along the east side of complainants' property may be considered as amended so as to meet proof that a marsh obstructed the passageway and required that the route pass around it, and a decree may be entered accordingly.

Appeal from Jackson; Parkinson, J. Submitted October 28, 1910. (Docket No. 153.) Decided November 11, 1910.

Bill by Elmore J. Bean and others against John C. Bean and others, to enjoin the use of an easement. From a decree for complainants, defendants appeal. Reversed.

*Nathan E. Bailey* (*Wilson & Cobb*, of counsel), for complainants.

*Richard Price*, for defendants.

STONE, J.   The bill of complaint in this cause was filed solely to restrain the defendants from passing over the lands of complainants, owned by them in severalty, against the will of complainants, under a claim of right of way.

Complainant Elmore J. Bean is the owner in fee of the E. ½ of the S. E. ¼ of section 12, in town 3 S., range 2 W., being in the township of Spring Arbor.   Complainant Leander McCain is the owner of the 80 acres of land immediately east of, and adjoining the complainant Bean's land, above described, to wit, the W. ½ of the S. W. ¼ of section 7, in town 3 S., range 1 W., being in Summit township.   The defendants are owners of, or interested in, 66 acres of land in said township of Summit, directly south of, and adjoining, the 80 acres owned by complainant Leander McCain, which is described as the N. ¼ of the W. ½ of the N. W. ¼ of section 18, in town 3 S., range 1 W.   This 66 acres is often referred to by the witnesses as the "Benair Farm," or "Benair 66 acres," having been formerly owned by one Benair Bean.   The land adjoining the land of complainant Elmore J. Bean on the south, and adjoining the defendants on the west, is owned by one Urania Bean, who is not a party to this suit.

As is not unusual, the section corners in the two townships do not correspond.   The east and west section line in the township of Summit, between the lands of the complainant McCain and the defendants, is between 27 and 28 feet farther south than the section line in Spring Arbor, between the lines of the complainant Elmore J. Bean and Urania Bean, so that the homestead, the land of Elmore J. Bean, is not at any point nearer than 27 and

a fraction feet to the lands of defendants. A plat attached to the answer of defendants is shown in the record, and hereto attached.

Many years ago the said homestead of complainant Elmore J. Bean, with other lands in Spring Arbor, was owned by John Bean, grandfather of Elmore J. Bean, the north half of which was in 1848 conveyed to John H. Bean, the father of complainant Elmore J. Bean, and occupied by said John H. Bean as a homestead, and the south of said 80 was occupied by said John H. Bean as tenant until his father's death, in 1871, when he obtained

title thereto by the will of his father, and was by said John H. Bean owned and occupied to the time of his death, in 1901, when the complainant Elmore J. Bean acquired title by the will of his father. Complainant Elmore J. Bean has continued to own and occupy said 80 acres to the present time. The land now owned by complainant Leander McCain was wild land, and was at an early date owned by one Moses Bean, brother of John H. Bean, until 1879, when he sold it to his son, Ambrose Bean, one of the witnesses in this suit; who, in 1900, sold it to the complainant Leander McCain, who went into possession and has so continued to the present time. In the year 1853, John H. Bean acquired title to the 66 acres of

land now owned by the defendants, which he continued to own and occupy to the time of his death, complainant Elmore J. Bean acquiring title thereto by the will of his father, and occupying the same, until, in the settlement of certain litigation growing out of the contest of the will of John H. Bean, who was also the father of defendant John C. Bean, on the 14th of March, 1907, he, Elmore J. Bean, conveyed said 66 acres to the defendant John C. Bean by ordinary warranty deed. As the 80 acres now owned by complainant Elmore J. Bean, and then occupied by John H. Bean as tenant, did not adjoin the said 66 acres, John H. Bean could not pass from one parcel to the other without passing over the land now owned by complainant McCain, or the land now owned by Urania Bean, or partially over both for a distance of nearly 28 feet.

The defendants answered the bill, admitting that they claimed the right to go across the premises of complainants, as alleged in the bill of complaint, and in that part of their answer in the nature of a cross-bill they set up a claim of ownership in fee, or to a right of way from the 66 acres through the narrow strip of land across the corner of complainant's land and Urania Bean's land, and along the east line of the land of complainant Elmore J. Bean to the highway, which runs east and west upon the north side of complainant's land. This they claim by adverse use and possession; and they claim that the same was passed as appurtenant to the 66 acres conveyed by the deed from complainant Elmore J. Bean to the defendant John C. Bean; and they set up the further claim that it was a way of necessity because of the conveyance of the 66 acres by Elmore J. Bean to the defendant John C. Bean in the settlement of said litigation.

Upon the hearing of this cause, some objection was made by the defendants to the alleged misjoinder of the complainants in this suit; but as the defendants in their answer have claimed the benefit of a cross-bill, and have asked for affirmative relief against both complainants,

this objection was not seriously urged at the hearing in this court, and will not be considered. A large amount of testimony was taken in this cause before the circuit judge. We have examined this record with a great deal of care to endeavor to ascertain the true history of the matter involved. There appears to be some [conflict in the testimony, but a careful examination shows that this conflict is more apparent than real. The circuit judge filed a written opinion in the case, and granted a decree to complainants in accordance with the prayer of the bill of complaint. The defendants have appealed.

Much weight should ordinarily be given to the opinion of the circuit judge, reached under such circumstances as here appear. It appears, however, from the opinion of the circuit judge, that his findings as to the facts were based largely upon notes taken by him at the hearing. We have examined the entire printed record. It is the claim of the defendants that the circuit judge misapprehended or misunderstood some of the testimony in the case. The vital question in this case is, in our judgment, that of adverse possession or prescriptive right. In his written opinion the circuit judge uses the following language referring to the testimony particularly of Ambrose Bean, who was the son of Moses Bean, and the grantor of complainant McCain:

"Ambrose says this north and south fence was straight, and he does not believe it swerved over at all on his father's side, although it might have done so a little. I think perhaps it did. But John H. Bean was not claiming the line between him and Moses, or between Urania and Moses, was crooked, and he may have deflected the fence a little to permit a more easy passage. But I feel quite confident he was not setting up any adverse claim, since after the death of Moses he intended to run his stone fence along the north line of the 66 acres to the quarter post, and move the stone on Urania's so as to afford room to drive, when Ambrose, who then owned the 80 to the east, came along and advised John H. to build the fence over to the east on him, and save moving the stone pile, refusing to sell the corner, but giving John H. the use of

it, if he would fence it up, until he, Ambrose, should want to use it. He says he was to have the right to close it up any time he saw fit. He told John H. where to run the fence, and to keep it up and he might use the corner. At that time John H. made no sort of claim that he had already acquired a part of the corner on the 80 of Ambrose. He assented to the latter's proposition, and there is no evidence the parties considered anything else than the whole triangular parcel in the corner. I think John H. then recognized Ambrose as sole owner; and, if he had deflected the line fence at this end a little onto Ambrose, it was for his own convenience, without any design to claim a right or the ownership, or to deprive his brother Moses of any of his land. And, had Moses understood that John H. was actually encroaching for the purpose of appropriating land not his own, their relations were such that it may, perhaps, be inferred that Moses would have promptly interfered."

Counsel for defendants concedes that if the evidence in the case shows that John H. Bean, after the death of Moses, intended to run his stone fence along the north line of the 66 acres to the quarter post, as stated by the circuit judge in his opinion, that the decree of the circuit court upon the question of adverse possession was correct, but he insists that there is no testimony in the case to this effect, and that the circuit judge must have misunderstood the testimony when it was given, or that in the interim which elapsed between the hearing and the filing of the opinion he forgot it. We cannot undertake to quote all of the testimony in this case, but we do here refer to the testimony of Nolan S. Bean, a son of John H. Bean, who refers to the conversation between his father and Ambrose Bean, which is said to have occurred in the year 1884, as follows:

"I was 48 years old the 2d day of last September. I know where this property is that's in dispute here; have known it ever since I was old enough to recognize anything. I was born and raised there on the old homestead, the 80 acres. I was over 21 years old before I left home. * * * I know where this driveway is along the east side of the homestead 80. It has been there ever since I can remem-

ber.   I know where the passageway is, going from the 80 into the Benair farm; that has always been there as far as I know.   I remember at one time building a stone wall on the east and west line between the Benair farm and what is now the farm of Leander McCain adjoining the passageway.   That was 24 years ago this last June.   I was working by the day at whatever I could get the most money at for my work.   I built that wall for father.   He came around by spells where I was working.

"*Q.* What was the surroundings of this neck going from the 80 into the Benair farm up to that time, what was there?   What was there in the nature of a fence or stone wall, or anything of that kind?

"*A.* On the east side there was—from where this neck began to the north of the gate, there was a rail fence.   My recollection is it was straight, made with posts and rails, straight as you could get a fence.   On the west side of Urania Bean's there was a pile of stone in the corner next to the section, and as it went around further it was rails— as it went around further to the south towards the gate.   That fence there on the east side of the passageway had been there several years.   I couldn't tell how long.

"*Q.* Who used that passageway, who used and controlled it, and had apparent ownership of it?

"*A.* Father did.

"*Q.* State whether or not there was any difference in his use of that passageway from his use of the rest of his land.

"*A.* I never had any reason to think there was.

"*Q.* It was fenced off and he used it?

"*A.* Yes, sir.

"*Q.* On this day, or any time when you were building that stone wall, you may state whether or not you overheard any conversation, or had any conversation, between your father and Ambrose Bean, whether you overheard any between those two, or had any with Ambrose yourself concerning that piece of land and the fence there.

"*A.* I guess you would have to call it overheard.

"*Q.* All right, call it anything you please.

"*A.* Ambrose made the suggestion to move the fence from where it was—it was getting pretty poor—to a tree that was there that set on Ambrose's line, near the line, run it south and come out—my recollection—about eight feet east of the gate where the old fence was.

"*Q.* (Showing witness paper): Whereabouts was this

tree that Ambrose suggested you run the fence to, whether it was to the north end or south end?

" *A.* North end.

" *Q.* Of the passageway?

" *A.* Yes.

" *Q.* There was a tree there, and he suggested to run the fence from that, south so it came about eight feet east of where the old fence was?

" *A.* Yes, sir.

" *Q.* What was said? Just tell us what was said there.

" *A.* I couldn't do it.

" *Q.* Tell us as near as you can what Ambrose said, and how he came to say it.

" *A.* How he came to say it I don't know. I was at work there at the wall—building the wall—and was calculating to run it *up to the end of the gate.*

" *Q.* Run it around to the end of the gate?

" *A.* Yes, east to where the old fence is. I was nearly there at that time, nearly up to where this old fence was. What he done it for I don't know.

. " *Q.* Tell us what he said, if you can remember, the substance of it.

" *A.* The substance was to move it back there and give us a better driveway through, more room.

" *Q.* Was your father there at the time?

" *A.* Yes, sir; he was talking to him; probably to both of us.

" *Q.* How wide was that passageway when the old fence was there, how much of a driveway was there through there?

" *A.* Well, I should judge there was about 16 feet. I never measured it.

" *Q.* State whether or not there was plenty of room to drive through there before this fence was moved back.

" *A.* Yes, sir; there was. We were intending to run this stone wall until we came to the east end of the old gate. We moved the fence over east. It would be my judgment we moved it about 8 feet on the south end east of the gate, and about 16 feet on the north. It's a good while ago. At that time there was a big butt of a tree stood there about the same width from the gate where Urania Bean stopped. I am speaking of the north section corner. This butt of the tree set in there for a post, and the old fence came up to that at that time. I should judge it was probably 16 feet wide, about the width of the gate.

I should think the passageway was about 16 feet wide at the north end as well as at the south end; that is according to my judgment.

"*Q.* This stone wall that runs along the line between Urania Bean and the homestead 80 and then turns around here on the passageway, was that there at that time ?

"*A.* There was no stone wall, just stone drawed in there in a big pile and throwed in there.

"*Q.* Did they extend around as it does now ?

"*A.* I don't know how it extends now.

"*Q.* You can see it on the map here.

"*A.* It came around a pace, and then I should say there was three or four lengths, maybe five lengths of rails to finish it up on the east and west wall between the Benair place—the north and south wall between the Benair place and Urania Bean's.

"*Q.* Was there anything said in that conversation, Mr. Bean, about your father buying that corner from Ambrose, or Ambrose selling it to him, or anything of that kind ?

"*A.* I didn't hear anything. They weren't with me all the time. They went away after awhile. I couldn't say that they went away together."

"*Q.* Was there anything said about Ambrose moving that fence back if you didn't keep the fence up, or whenever he wanted to, or anything of that kind ?

"*A.* Not that I heard.

"*Q.* Did your father make any request of him to give him any more land, or to sell him any more land at all in your presence at that time ?

"*A.* Nothing that I heard. I would have heard it if he had. When I first saw this old fence on the east side of the passageway, it extended down south, and also over to the north, clear to the highway. It was woods on Ambrose's side. Father had cleared the timber and pastured. After father acquired the Benair farm, he tilled it the same as he did the rest of his place. I don't remember whether there was any of it cleared when he first bought it. I should think there must have been. There was a house on it at least, in my first remembrance. At the time I was building this stone wall some of the Benair farm was cleared and under tillage. Father owned it and was tilling it, and he had been going back and forth in there, tilling that farm, either he or his men, ever since I could remember."

Being further interrogated, on cross-examination, this witness said:

"My idea was to leave the old fence next to Ambrose as it was, and then widen it out on the west side. That was father's idea."

Defendants' counsel contends that the above-quoted testimony corresponds with the testimony of John C. Bean, Sinkler Bean, and every other witness in the case who gave any testimony touching this point. He further claims it is not contradicted in the least, but rather corroborated by Ambrose Bean, the main witness for complainants, who testified that, prior to the time the fence was moved over to the east, John H. Bean had a passageway there which "he took." This same witness testified as follows:

"*Q.* I want to get the whole thing. This passageway you say Mr. John H. Bean took—

"*A.* (Interrupting). That I gave him?

"*Q.* You didn't give him anything before the time you are talking about?

"*A.* No.

"*Q.* He took it?

"*A.* Yes.

"*Q.* That's the idea. That passageway which he took and which he had before you gave him anything, was the passageway running between the stone pile you are talking about and the fence on the east side?

"*A.* Yes, sir. You have got me.

"*Q.* And the passageway was how wide, do you think?

"*A.* I should say it was nearly a rod.

"*Q.* When you came along there, Nolan was building this fence, and his father was there, they were also going to repair this old fence?

"*A.* I could not tell you that.

"*Q.* Was there room between the fence and the stone pile (next to Urania Bean's) to drive through?

"*A.* Before I gave him this piece?

"*Q.* Yes.

"*A.* He did drive through there.

"*Q.* Are you sure that old fence as it came up on the section line continued straight north to the other—I should say straight south—or did it swerve over some?

" A. I couldn't tell you.
" Q. It might have swerved over some ?
" A. It might a trifle; yes.
" Q. So he would have room between this stone pile ?
" A. He might have laid it over there.
" Q. That is what he took before that ?
" A. Yes."

It is the further claim of defendants' counsel that it appears by the testimony of the witnesses on both sides of the case that a fence had been maintained on the east side of this passageway for years before this shift was made in 1884. John G. Bean, a son of Urania Bean, testified that he lived in Spring Arbor most of his life, about 26 years. He testified as follows:

"I know where this driveway is in question between the Benair farm and the old homestead at the southeast corner. I couldn't tell how long that has been there. It has been there as long as I can remember.

" Q. Who has used that driveway and had possession of it, and control of it as long as you can remember?

" A. I suppose Uncle John and the rest of them there have used it. The people on the place, his estate has, and him, I think. I have been around my mother's farm a good share of the time ever since I was born. During all that time this passageway between the two farms has been fenced on each side. There has been a gate going into the Benair farm.

"Q. Who had control of that all of this time?

"A. Uncle John did, I suppose, and the people that ran it.

"Q. Has anybody else, at any time, to your knowledge, made claim to that passageway until this suit was begun?

"A. Not that I know of.

"Q. State whether or not John H. Bean used it and exercised dominion over it the same as he did the rest of his farm, so far as anybody could observe.

"A. I think he did to all appearances.

"Q. State whether or not it was plain to any one who had occasion to inquire into, or got over there into that vicinity at all, to see that John H. Bean was using and possessing that neck of land in connection with the rest of his farm.

"A. Yes, sir; I think it was."

The witness Ambrose Bean was one of the main witnesses for complainants, and had at one time been the owner of the McCain farm. What he says, therefore, upon this subject of the old way having been there, is somewhat significant, and we quote a little further from his testimony:

"*Q.* At the time you came along there and found Nolan building this stone wall, there was then and had been before this a fence running along the east side of that neck of land separating it from this 80, was there not?

"*A.* Between John Bean and me?

"*Q.* Yes.

"*A.* Yes, sir; clear through.    *   *   *

"*Q.* As it went south, did it go clear up to the point where this stone wall was between the Benair property and yours?

"*A.* That was the calculation.   He might have throwed it off a little there.

"*The Court:* It did go up to there?

"*A.* That's what I suppose.

"*Q.* There was an old fence there?

"*A.* Yes, sir.

"*Q.* Running clear up to the point of the old wall?

"*A.* Yes, sir.    *   *   *

"*Q.* How wide a passageway was there in which to drive through from the homestead 80—you know what I mean?

"*A.* Yes, sir.

"*Q.* Over onto the 66 acres, how much of a passageway was there before he moved that fence?

"*A.* There was no particular passageway only as he took it.

"*Q.* That may be.   I am not finding fault with that. How much of a passageway did he take there?

"*A.* It might have been two rods, and it might not have been two rods.    *   *   *

"*Q.* I want to get the whole thing.   This passageway you say Mr. John H. Bean took—

"*A.* (Interrupting).   That I gave him?

"*Q.* You didn't give him anything before the time you are talking about?

"*A.* No.

"*Q.* He took it?

"*A.* Yes.

"*Q.* That's the idea.    That passageway which he took, and which he had before you gave him anything, was a passageway running between this stone pile you are talking about and the fence on the east side?

"*A.* Yes, sir.    You have got me.

"*Q.* And that passageway was how wide, do you think?

"*A.* I should say it was nearly a rod   *   *   *   It was wide enough for a load of hay to go through.    That is pretty near 16 feet.   *   *   *

"*Q.* So your father and John H. Bean were not on the very best of terms?

"*A.* They were not.

"*Q.* It ain't very likely your father would make any concessions to him, or John would make any concessions to him?

"*A.* No; he wouldn't.   *   *   *

"*Q.* On the east side of that stone pile—the stone pile next to Urania Bean—he had room enough to get out with a load of hay?

"*A.* Yes, sir.

"*Q.* You have no idea he ever did that with your father's permission?

"*A.* I know well enough he didn't.   *   *   *

"*Q.* Did you regard the old fence that was there as the line fence?

"*A.* It was all the fence there was there.

"*Q.* You regarded it as the line?

"*A.* Yes, sir.

"*Q.* John H. Bean regarded it as the line, too?

"*A.* Yes, sir.

"*Q.* He drove along up side of that on the west side and went in between that and the stone pile with a load of hay?

"*A.* There was a little hole in there.    He could, in that shape, right through that little hole.    Call it what you are a mind to.   *   *   *

"*Q.* You didn't tell John H. Bean, at that time when you went up there and found this fence was moved, he was occupying any of your land?

"*A.* I did not.

"*Q.* He didn't tell you he was?

"*A.* He did not.

"*Q.* Whatever land he had there at that time he had used it as his own just the same as he did anything else?

"*A.* He did.

"*Q.* Anybody could see, who was at all interested, up to that time, that John H. Bean was in possession of that land?

"*A.* The hole he went through.

"*Q.* Drove right through?

"*A.* Yes.

"*Q.* There was no concealment about it?

"*A.* No concealment whatever.

"*Q.* He had used that for years and years?

"*A.* He must have went through the place ever since he bought the place until that time.

"*Q.* That was in 1853?

"*A.* I don't know when that was."

Fred R. Bean, another son of Urania, 40 years of age, who had always lived on the farm with his mother, testified that a driveway had been there as long as he could. remember.

The defendant John C. Bean testified that he helped draw the rails. He and Sinkler and their father, John H. Bean, laid the fence up on the east side of the passageway about 45 years ago; that this was done the time the fence was built along the township line. He testifies that he should think there were about 12 feet of passageway along the north end of the quarter, and about the same at the south.

Sinkler Bean, another son of John H. Bean, remembers helping John draw the rails to fence on the east side of this passageway along the town line. This he testifies was built at the time that Moses and John H. Bean had divided the line fence between the two 80's, John H. taking the south end, and Moses the north. He testified that the fence was built with rails, an ordinary worm fence, until they got near a post standing opposite the northeast corner of Urania Bean's property, and that then they went east of this post, and then swerved off to the east until they got up to the section line between the Benair farm and Moses Bean's farm, that there was stone and a rail fence on the west side at that time, and that they first used a pair of bars to go into the Benair farm, and subse-

quently a gate was built. He also testified that the fence remained there in the same condition until about the year 1883, when the rail fence was taken down and a barb-wire fence was substituted for it a few feet farther east. The following questions and answers are pertinent:

"*Q.* When you fenced this neck of land at the time you have spoken of first, how wide a passageway was there through there between this fence and the east side of that neck of land?

"*A.* Well, sir, I should have to approximate it. I know we drew hay and wheat in the bundle through there, and went through with everything of machines about, on our farm at least. I should think it was anywhere from 14 to 16 feet, possibly more.

"*The Court:* At the time you helped build the fence there, your father built that and you drew the stuff. When you reached that first section post, then you swerved a little onto Moses?

"*A.* Yes, sir.

"*Q.* How did you come to do that?

"*A.* I don't know. We done it, that's all I know about it.

"*Q.* Was there any talk between your father and Moses that he might do it, that you heard?

"*A.* I don't think Moses was there at all. I never heard any reference.

"*Mr. Price:* That post he is referring to there, the court called it a section post, and so did Mr. Wilson, but neither of them have called it a section post. Tell us about it.

"*A.* That post I think was set east of the town line, a little, and directly east from the section line — Urania's north line   *   *   *

"*Q.* From that time to the present, down to the time this litigation was commenced, who controlled, owned, operated, and exercised dominion over this driveway and neck of land?

"*A.* I should consider father did. I never heard anybody else make any claim about it. I never heard any remark about ownership or any other—or any disputed right to it at all, or any discussion from anybody.   *   *   * I looked upon it as a right of way belonging to father; had no thought of anything else except it was our own right of way to go between these pieces of land. It never

was called to my mind at all.   *   *   *   The last time I was there I could see no difference, no change of the wagon tracks from what they had always been."

The undisputed evidence of the witnesses is that the wagon tracks straddled, as they say, the south section corner, about as the wagon tracks or wheel tracks are indicated upon the diagram.

Upon examining the mass of testimony in the case, we are impressed with the claim of the defendants that by a clear preponderance of the evidence it appears that at least 14 feet in width of the neck of land constituting the driveway connecting the homestead 80 with the Benair farm was owned absolutely by John H. Bean at the time of his death.   This excludes the 4 or 5 feet in width on the east side, which, under the testimony of Nolan and Ambrose Bean, might be said to be held by John H. Bean under a license, or permission, given at the time the fence on the eastern side was shifted over.   We are of opinion that this claim of defendants is supported by a preponderance of the evidence, and that John H. Bean was the owner of the same by adverse possession of more than 15 years.   It is true he had never cultivated this strip, but he had used it as a passageway between the homestead 80, all of which he had owned since 1871 (and the north half of which he had owned since 1848, and the south half of which he had cultivated as a tenant during the intervening years) and the Benair farm which he had owned since 1853.   He had no color of right there, but the entry upon and possession of lands by a person as his own are enough to start adverse possession.   He "took it," as Ambrose testified, and that without any permission from him or any one.

The right to and the use of the right of way may be acquired by adverse possession or prescription the same as title to the fee of the land.   In Tiedeman on Real Property, at section 497, it is said:

"As a general proposition, any acts of ownership, exercised by the wrongdoer which would make his possession

sufficiently visible and notorious, as to raise the presumption of notice to the owner of such adverse holding, will be ample evidence of the adverse claim of title, and actual notice to the owner or any express claim or affirmation of such claim of title is not required to establish its existence."

Applying that rule to this case, it must be said that the possession of John H. Bean of the neck of land connecting the two farms was adverse to all the world, and had ripened into a title before the fence was shifted to the east, as explained in the testimony referred to.   The possession of a lane thus connecting two pieces of land, used as a passageway, may ripen into title, the same as though it had been cropped.   We are unable to find any evidence in the record that John H. Bean ever asked or obtained permission from anybody to thus appropriate the strip of land.

As to that portion of this strip of land which is taken from the premises of Urania Bean, she not being a party here, her rights cannot be affected by the decree in this case.   It will be borne in mind that complainants in their bill of complaint allege than John H. Bean during his lifetime passed and repassed over this strip of land, but they claim it was under a license of the owner.   We think they have failed to prove this, and that the contrary appears.   It appears that John H. Bean and Moses Bean were not on friendly terms.   It is shown that more than 45 years ago the fence was built, and this neck of land passed into the possession of John H. Bean, who continued to use it exclusively, and no one ever questioned his right to it in any way. *Sanscrainte* v. *Torongo*, 87 Mich. 69–83 (49 N. W. 497); *Ward* v. *Nestell*, 113 Mich. 185–189 (71 N. W. 593); *Greene* v. *Anglemire*, 77 Mich. 168–171 (43 N. W. 772).   All of the authorities agree that the adverse possession must have been for the whole period prescribed by statute, actual, open, visible, notorious, continuous, and hostile.   We think that the evidence brings the case within that rule.

It appearing that when on March 14, 1907, complainant Elmore J. Bean conveyed the 66 acres to John C. Bean, said Elmore J. Bean was the owner through the will of his father of the homestead and the 66 acres, and also of the said strip of land, the defendants are in a position to claim said strip of land both as a way of necessity, and as appurtenant to the 66 acres. The rule that an easement or way by necessity will pass by implication, as well where the severance of the dominant and servient estates is effected by legal proceedings, as where the grant is voluntary, is generally recognized. The way of necessity passes with each successive transfer of the title, whether voluntary or involuntary. *Proudfoot* v. *Saffle*, 62 W. Va. 51 (57 S. E. 256, 12 L. R. A. [N. S.] 482); *Morgan* v. *Meuth*, 60 Mich. 238 (27 N. W. 509); *Lathrop* v. *Elsner*, 93 Mich. 599 (53 N. W. 791); *Ann Arbor Fruit, etc., Co.* v. *Railroad Co.*, 136 Mich. 599 (99 N. W. 869, 66 L. R. A. 431). When the owner of an entire estate makes one part of it visibly dependent for the means of access upon another, and creates a way for its benefit over the other, and then grants the dependent part, the other part becomes subservient thereto, and the way constitutes an easement appurtenant to the estate granted, and passes to the grantee as accessorial to the beneficial use and enjoyment of the granted premises. *National Exchange Bank* v. *Cunningham*, 46 Ohio St. 575 (22 N. E. 924).

Complainants' counsel contend, however, that:

"As there never was any unity of ownership of the McCain strip and the other land, it cannot be burdened with the way of necessity by any act of complainant Bean."

But we have shown that there was unity of ownership in John H. Bean. This strip of land between the two farms became the absolute property of John H. Bean by adverse possession. And this is virtually conceded by complainants' counsel, unless the evidence shows that

John H. Bean's possession of this land was by permission or license.   It should be borne in mind that by this record complainant Elmore J. Bean took all this property, including this strip, under his father's will, as residuary legatee.   He owned whatever his father, John H. Bean, owned, that had not been otherwise disposed of.   But, if we were to hold that there was no unity of title, it would not follow that a way of necessity would not arise.   A right of way can be acquired by prescription, or adverse possession, the same as title to the fee.   If John H. Bean did not absolutely own this passageway between the two farms, he at least had acquired a right of way over it, which became appurtenant to the 66 acres, and all belonging to Elmore J. Bean, it passed with the deed from Elmore to John.   In fact, it appears from the testimony of Elmore that it was not until after the making of the deed to John that he made up his mind to exclude him from this means of getting to his farm.

We cannot agree with complainants' counsel that the right of way by necessity ceased when John C. Bean made his agreement with McGonegal.   The testimony shows that McGonegal's land is impassable, and, as a passageway, was worthless to the defendant John C. Bean. True, he acquired a right to go south over McGonegal's land, but he found it marshy and impassable.

In their prayer for relief in their cross-bill, defendants pray that the court decree that they have a right to an easement and right of way along the east side of said 80-acre farm owned by said Elmore J. Bean to the highway on the north, and through said neck of land to get to, and from, the said 66-acre farm, and as appurtenant thereto. From the evidence it appears that a marsh prevents passage along the entire east side of said farm, but that the usual traveled route is around said marsh.   We think that the answer should be treated as amended to correspond with the evidence in that regard, and, as so amended, that the defendants should have the relief prayed for in their cross-bill, the width of such passageway to be 14 feet

over said south section corner, the center of the wheel track over said strip to be the center of said route.

The decree below will be reversed, and a decree entered here in accordance with this opinion, said defendants to recover their costs in both courts.

BIRD, C. J., and OSTRANDER, HOOKER, and MOORE, JJ., concurred.